

FILED

Jun 18 2024

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY    s/ SusanNyamanjiva    DEPUTY

ORDERED UNSEALED on **06/26/2024   s/ RC**

~~SEALED~~

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

January 2023 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>JOSE ANGEL PORTILLA (1),<br>KATHIE SILVA (2),<br><br>    Defendants. | Case No. ___'24 CR1313 JO___<br><br>I N D I C T M E N T<br><br>Title 18, U.S.C., Sec. 371 –<br>Conspiracy To Commit Health Care<br>Fraud and Pay Unlawful<br>Remunerations; Title 42, U.S.C.,<br>Sec. 1320a-7b(b)(2) – Payment of<br>Illegal Remunerations;<br>Title 18, U.S.C., Secs. 982(a)(7)<br>and 982(b) – Criminal Forfeiture |

The grand jury charges, at all times material:

INTRODUCTORY ALLEGATIONS

The Medicare Program

1.    The Medicare program ("Medicare") was established under Title XVIII of the Social Security Act.  Medicare was a federal health care program providing benefits to persons who are sixty-five years of age or older, or disabled. Medicare was administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who receive benefits under Medicare were referred to as Medicare "beneficiaries."

VHC:cms:San Diego:6/18/24

Medicare was a health care benefit program as defined by 18 U.S.C. § 24(b).

2. Medicare had four parts: hospital insurance (Part A), medical insurance (Part B), Medicare Advantage (Part C), and prescription drug benefits (Part D). Medicare Part B helped pay the cost of physician services, medical equipment and supplies, and other health services and supplies not paid by Part A. Specifically, Medicare Part B covered medically necessary physician office services, including the ordering of durable medical equipment ("DME") such as arm, leg, back, and neck braces.

3. CMS contracted with various entities to carry out aspects of its administration of Medicare. CMS used Medicare Administrative Contractors ("MACs") to receive and process claims based on region and type of claim. The MACs for DME were Noridian Healthcare Solutions, LLC and CGS Administrators, LLC.

PROVIDER ENROLLMENT

4. Providers could apply for enrollment in the Medicare program or make a change in their enrollment information using either the Internet-based Provider Enrollment, Chain and Ownership System (PECOS), or the paper enrollment application process, specifically, by completing and submitting a form called a "CMS 855A." The CMS 855A required providers to supply information including ownership interest by any entity or individual with "direct or direct ownership of, a partnership interest in, and/or managing control," where "managing control" included persons who had "operational or managerial control over the provider, or conducts the day-to-day operations of the provider."

5. The CMS 855A notified applicants of the criminal and civil penalties for falsifying information, and required applicants to sign a

2

certification binding them to "all of the requirements in the Certification Statement," and to "immediately" notify the Medicare contractor if any information furnished on the application was not true, correct, or complete, and of any future changes to the information.

6.    The Certification Statement required the applicant to abide by the Medicare laws, regulations and program instructions, and warned that payment of a claim by Medicare was conditioned upon the claim and underlying transaction complying with Medicare laws, regulations, and program instructions ("including, but not limited to, the Federal anti-kickback statute and the Stark law"). The Certification Statement further required the applicant to agree that he/she would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and would not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

7.    Enrolled providers were provided with online access to Medicare manuals and services bulletins describing proper billing procedures and billing rules and regulations.

8.    A National Provider Identifier (NPI) is a 10-digit number that uniquely identifies covered health care providers for administrative and financial transactions. The Health Insurance Portability and Accountability Act of 1996 requires the use of NPIs in standard transactions, such as health care claims.

9.    The Provider Transaction Access Number (PTAN) is a unique Medicare identification number. This number is assigned to providers once their enrollment has been approved.

MEDICARE REQUIREMENTS FOR ORTHOTHICS

10.  To be paid by Medicare, a service or an item must have been reasonable and necessary for the diagnosis or treatment of an illness or injury or to improve the functioning of a malformed body member.

11.  The DME MACs developed local coverage determinations ("LCDs") for some covered orthotic braces, including back and knee braces. The LCDs outlined the conditions under which DME MACs would pay suppliers for those braces.

12.  LCD L33318 outlined the following requirements for knee braces:
- A knee orthosis, with an adjustable flexion and extension joint that provides both medial-lateral and rotation control (L1843, L1845, L1851, L1852), is covered if the beneficiary has had recent injury to or a surgical procedure on the knee(s).
- Knee orthoses L1832, L1833, L1843, L1845, L1851 and L1852 are also covered for a beneficiary who is ambulatory and has knee instability due to certain specified conditions.
- For codes L1832, L1833, L1843, L1845, L1850, L1851 and L1852, knee instability must be documented by examination of the beneficiary and objective description of joint laxity (e.g., varus/valgus instability, anterior/posterior Drawer test).

13.  Claims for L1832, L1833, L1843, L1845, L1850, L1851 or L1852 would be denied as not reasonable and necessary when the beneficiary did not meet the above criteria for coverage. For example, they would be denied if only pain or a subjective description of joint instability was documented.

14.  LCD L33790 outlined the following requirements for back braces: A spinal orthosis is covered when it is ordered for one of the following indications:
- To reduce pain by restricting mobility of the trunk; or
- To facilitate healing following an injury to the spine or related soft tissues; or
- To facilitate healing following a surgical procedure on the spine or related soft tissue; or
- To otherwise support weak spinal muscles and/or deformed spine.

15. If a spinal orthosis was provided and the coverage criteria was not met, the item would be denied as not medically necessary.

<u>Relevant Entities</u>

16. HealthStar LLC was a DME supply company located at 2445 Otay Center Drive, Suite 110G, in San Diego, California. Kathie SILVA was the owner of HealthStar. SILVA applied for an NPI number for HealthStar, and HealthStar was assigned NPI number 1225596240 on or about March 8, 2019. On or about September 16, 2019, SILVA signed Medicare enrollment forms as an authorized official for HealthStar to become a DME supplier for Medicare. The enrollment paperwork did not identify Jose PORTILLA as having any role in HealthStar.

17. Spectra Health & Wellness, LLC was a DME supply company located at 101 North US Highway 1, Suite 213 in Fort Pierce, Florida. Kathie SILVA was identified in Florida Secretary of State records as a manager. On or about October 7, 2019 SILVA signed paperwork in the Medicare enrollment system to be added as an authorized official for Spectra Health. The enrollment paperwork did not identify Jose PORTILLA as having any role in Spectra Health.

18. Best Lead Solution (BLS) was a self-described "marketing company" with a principal place of business at 1074 Broadway Avenue, Chula Vista, California 91911 and an alternate business address of 412 Sanibelle Circle, Unit 67, in Chula Vista, California. Jose PORTILLA was its owner and CEO.

19. Prizm Media Inc. was a marketing company based in Vancouver, Canada.

20. MedTech Worldwide, Inc. was a telemedicine company.

## Count 1

Conspiracy to Commit Health Care Fraud and Pay Unlawful Remuneration

18 U.S.C. § 371

21.    Paragraphs 1 through 19 of the Introductory Allegations of this Indictment are re-alleged and incorporated by reference.

22.    Beginning no later than in or about 2016, and continuing through in or about 2022, within the Southern District of California and elsewhere, defendants JOSE ANGEL PORTILLA and KATHIE SILVA conspired with each other and with others to knowingly, willfully, and intentionally agree to commit the following offenses against the United States:

a. To knowingly and willfully, with the intent to defraud, execute a material scheme to defraud Medicare, a health care benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), and to obtain, by means of materially false and fraudulent pretenses, representations, promises, and omissions and concealments of material facts, money and property owned by, and under the custody and control of, Medicare, in connection with the delivery of and payment for health care benefits, items, and services, in violation of 18 U.S.C. § 1347;

b. To knowingly and willfully solicit and receive any remuneration (including any kickback, bribe, or rebate) directly and indirectly, overtly and covertly, in cash and in kind, in return for referring individuals to DME companies and "marketing companies" for the furnishing and arranging for the furnishing of DME, payment for which was made in whole and in part under a federal health care

6

program, namely, Medicare, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A); and

c. To knowingly and willfully pay any remuneration (including any kickback, bribe, or rebate) directly and indirectly, overtly and covertly, in cash and in kind, to induce persons to refer individuals to DME companies for the furnishing and arranging for the furnishing of durable medical equipment, payment for which was made in whole and in part under a federal health care program, namely, Medicare, in violation of 42 U.S.C. Sec., 1320a-7b(b)(2)(A).

### Purpose of the Conspiracy

23.   It was the object of the conspiracy for the defendants and their co-conspirators to unlawfully enrich themselves by soliciting, and receiving, unlawful payments for referrals of Medicare beneficiaries to DME companies, and to so-called "marketing companies" who sold the information to DME companies, and then for the DME companies to submit fraudulent claims to Medicare, a federal health care benefit program, for DME prescribed to those Medicare beneficiaries, while concealing from Medicare the material facts that the prescriptions were signed by physicians who: had no legitimate doctor-patient relationship with the beneficiary; had not conducted a legitimate medical evaluation of the beneficiary; had not impartially determined that the beneficiary actually needed the DME; and were paid kickbacks for each prescription the doctor signed.

### Manner and Means of the Conspiracy

24.   The manners and means by which the defendants and their co-conspirators sought to accomplish the objects of the conspiracy included the following:

7

a. It was a part of the conspiracy that Defendant Jose PORTILLA operated, managed, or hired call centers located in Mexico and elsewhere, filled with call center agents who attempted to locate and contact Medicare beneficiaries living in the United States.

b. It was a part of the conspiracy that Defendant Jose PORTILLA and his co-conspirators created call scripts for the call center agents to attempt to persuade Medicare beneficiaries to agree to accept one or more DME product.

c. It was a part of the conspiracy that Kathie SILVA located, contracted with, and paid telemedicine companies to get doctors' signatures on orders for the DME products.

d. It was a part of the conspiracy, and known and intended by PORTILLA and SILVA, that the medical providers at the telemedicine companies signing the orders did not conduct physical examinations of the Medicare beneficiaries, and in most cases did not speak to the Medicare beneficiaries.

e. It was a part of the conspiracy that SILVA supplied the text that she wanted the doctors to use in the doctors' notes, identified the DME products that the doctor could order, and asked for some prescriptions to be "re-scripted" if the telemedicine doctor who signed the prescription was already under scrutiny by Medicare.

f. It was a part of the conspiracy that PORTILLA and SILVA through BLS sold "completed doctors' orders" or "D.O.'s" to DME companies, charging a fee for each DME product prescribed in the doctor's order, such as back braces for $320 each, knee "bilateral" (both right and left) for $350,

single knee braces for $175, a shoulder brace for $150, ankles "bilateral" for $200, single ankle braces $100, and wrist braces $75 apiece.

g. It was a part of the conspiracy that the D.O.'s consisted of a Medicare beneficiary's name, personal information, Medicare number, and a signed doctor's order prescribing one or more DME products for that beneficiary – all of which enabled the DME company to bill Medicare for the DME products.

h. It was a part of the conspiracy that the DME companies that purchased D.O.'s from BLS submitted and caused to be submitted claims to Medicare and other insurers for the DME for those beneficiaries, falsely representing that the claims complied with all laws and Medicare regulations, including the anti-kickback provisions, when in fact the DME companies had paid kickbacks to obtain the referral of those beneficiaries.

i. It was a part of the conspiracy that the claims submitted and caused to be submitted by the DME companies falsely represented that the claims were for DME that was medically necessary for the beneficiary, when in fact the DME was recommended by a physician who had no valid doctor-patient relationship with the beneficiary, and had not conducted an appropriate physical examination and exercised independent medical judgment to determine whether the DME was medically necessary for the beneficiary.

j. It was a part of the conspiracy that to disguise their fraudulent kickback scheme, PORTILLA and SILVA and their

co-conspirators entered into various sham agreements, including contracts for "lead identification services," "raw leads," "software licensing" or "verification" that concealed the volume-based, per-brace fees PORTILLA and SILVA received in exchange for the completed doctors' orders.

k. It was a part of the conspiracy that, if Medicare did not pay for a DME product in a D.O. sold by BLS, BLS would offer a credit or replacement, thus reflecting that the payment was a per-brace kickback, and not a payment for marketing or other services that had been completed.

l. It was a part of the conspiracy that Defendant Jose PORTILLA operated from Mexico, and that Kathie SILVA operated from San Diego, California, in part to collect criminal proceeds in a United States bank account that she then transferred to PORTILLA's foreign bank accounts.

m. Using the above manners and means, among others, BLS was paid over $4 million by DME companies and marketing companies in kickbacks for supplying referrals to Medicare beneficiaries for DME.

25.    In furtherance of the conspiracy, the following overt acts were committed by defendants and others in the Southern District of California and elsewhere:

a. On or about December 18, 2017, SILVA emailed a telemedicine company employee expressing her "concern regarding our account with you, we work with other Telemeds and it is sad to say that you are the only ones that return less than 50% of the consults approved."

10

b. In or about May 2018, SILVA sent to a telemedicine provider a set of sample doctor notes, explaining, "Also attached is the word file which specifies the verbiage as well as specific Diagnosis codes to be used for prescribing braces."

c. In or about June 2018, SILVA requested help from a telemedicine representative, explaining that "we all know medicare audits are getting tougher," and asking to "pass this information (below) along to the telemed doctors, while writing the scripts, to decrease the number of audits and denials that we do see." The specific verbiage SILVA wanted expressly referenced some kind of physical examination or observation -- such as a range of motion test, one leg stand test, evaluation of gait, or testing flexion of the back, including, for example, specifically requesting that for a wrist brace: "The physician objective assessment has to indicate where the wrist pain is, range of motion, and diagnostic testing completed on the wrist. There has to be a passive/active/supination range of motion testing." For an ankle brace she specified, "Range of motion has to be documented also. A diagnostic testing has to be done on the ankle…" And for a back brace, she directed, "The physician's objective assessment has to contain the test of lateral flexion, extension and flexion."

d. On or about April 17, 2019, PORTILLA told a marketer that, "in order to be compliant," PORTILLA would create invoices that appeared to show that BLS was paid for a certain number of hours of marketing services, and not a per-brace kickback, but acknowledged, "Right I mean we're gonna have

our own agreement but in writing, we need to do it that way. Has to be marketing our hourly rates and such and such. So I know that's the way we're supposed to be handling."

e. In an August 13, 2019 email to a DME company owner, SILVA introduced herself as "Jose Portilla's wife" and explained that "he [PORTILLA] has delegated a part of the set up with . . . telemed" to her.

f. On or about September 16, 2019, SILVA signed Medicare enrollment forms as an authorized official for HealthStar LLC, a DME company located in San Diego, California, to become a DME supplier for Medicare.

g. Also on or about September 16, 2019, SILVA signed a Certification Statement, agreeing to abide by the Medicare laws, regulations and program instructions, "including, but not limited to, the Federal anti-kickback statute and the Stark law." The Certification further required the applicant to agree that he/she would not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare, and would not submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

h. On or about October 7, 2019, SILVA emailed the signed enrollment application for HealthStar to others, including PORTILLA.

i. On or about October 13, 2019, PORTILLA sent a DME company owner a "Price List for Telemed DO's", which included a wrist brace for $100, shoulder brace for $200, ankle brace for $100, hip brace for $400, and knee for $200 each.

12

j. On or about October 21, 2019, SILVA emailed to PORTILLA the signed purchase agreements for HealthStar and Spectra, each of which listed SILVA as the 95% owner and another individual, not PORTILLA, as a 5% owner. SILVA wrote, "Love here are the purchase agreements for the DME you will find the PTAN [and NPI."

k. On or about December 5, 2019, SILVA caused Spectra to submit a false and fraudulent claim for reimbursement to Medicare for a left knee brace, for Medicare beneficiary Maria P, a resident of San Diego.

l. On or about March 30, 2020, PORTILLA asked a marketing company, who offered a contract for "marketing services", to "Please send me the contract I will buy 50 leads."

m. On or about April 6, 2020, Silva emailed a telemedicine provider, with an attachment entitled "Corrections T4 flagged MD -1" in which patients were listed next to the notation, "Flagged MD Simon Roy/ Need new doctor."

n. On or about May 28, 2020, SILVA emailed a marketing company from which BLS purchased D.O.'s for resale to DME companies, complaining of being overcharged: "for the week Of May 15 -May 21 we rcvd [received] 94 completed DO we were charge for 98pts [patients]. Please clarify. thank you."

o. On June 8, 2020, showing her ongoing involvement in handling telemedicine, SILVA advised a telemedicine company employee, "please do let us know as soon as you get more doctors. We are in URGENT need of doctors on the following states." SILVA listed 20 states in her request.

p. On September 14, 2020, PORTILLA offered to sell telemedicine D.O.s to M.B. PORTILLA said that he had been in the marketing business for 20 years and owned seven call centers in five different countries, all in Latin America. He mentioned that he owned the call centers himself "because I have control over the leads since the first time we speak to these people." He offered "100% replacement on the returns/cancels" if a patient rejected the braces.

q. On or about September 15, 2020, PORTILLA sent a "Price List" to M.B., with the following prices:
   Back Brace $450
   Knee Brace $275
   Suspension Sleeve no cost
   Elbow $150
   Wrist/Hand Brace $125
   Shoulder /Arm Abduction System $250
   Ankle Brace $125
   Heel Cup no cost
   Hip Brace $475

r. On or about October 1, 2020, SILVA caused HealthStar to submit a false and fraudulent claim for reimbursement to Medicare for a right knee brace, for Medicare beneficiary Consuelo F, a resident of San Diego.

s. On or about November 9, 2020, PORTILLA wrote to a DME company owner who was purchasing D.O.'s from BLS: "Please confirm once you send funds and I'll make sure you get your quota per [brace] to make it transparent on both campaigns."

t. On or about December 8, 2020, PORTILLA offered to reduce the per brace cost "temporarily" to $225.

u. On or about January 17, 2020, a DME company submitted a false and fraudulent claim for reimbursement to Medicare for a back brace, left and right knee braces, and two

14

suspension sleeves for Medicare beneficiary Rosa R, based on a D.O. purchased from BLS.

v. On or about January 20, 2020, a DME company submitted a false and fraudulent claim for reimbursement to Medicare for a back brace for Medicare beneficiary Maria C, based on a D.O. purchased from BLS.

w. On or about January 22, 2020, a DME company submitted a false and fraudulent claim for reimbursement to Medicare for left and right knee braces, and two suspension sleeves, for Medicare beneficiary Mary C, based on a D.O. purchased from BLS.

x. On or about January 22, 2020, a DME company submitted a false and fraudulent claim for reimbursement to Medicare for a back brace, a knee brace and a suspension sleeve for Medicare beneficiary Ramona L, based on a D.O. purchased from BLS.

y. On or about July 23, 2020, SILVA and PORTILLA caused BLS to pay $28,120 to a telemedicine company to purchase signed prescriptions.

z. On or about August 27, 2020, PORTILLA and SILVA caused BLS to pay $19,350 to a telemedicine company to purchase signed prescriptions.

aa.  On or about September 11, 2020, PORTILLA and SILVA caused BLS to pay $7,600 to a telemedicine company to purchase signed prescriptions.

bb.  On or about September 22, 2020, PORTILLA and SILVA caused BLS to pay $3,500 to a telemedicine company to purchase signed prescriptions.

15

cc.  On or about September 29, 2020, PORTILLA and SILVA caused BLS to pay $1,230 to a telemedicine company to purchase signed prescriptions.

dd.  On or about January 29, 2021, a DME company owner informed PORTILLA, "We received a few more angry patients today…a lot of people have been pissed yelling saying they were going to call Medicare…I cannot afford to get in trouble with CMS."

ee.  On or about April 15, 2021, the DME company owner informed PORTILLA, "You keep sending orders but we deny so many of them bc of all types of issues. We receive these scripts and people say they don't want them all the time."

ff.  On or about May 17, 2021, PORTILLA communicated with a DME company owner, "even though we are behind [in supplying braces do you have] any plans to increase a little for example if you send [$]15K I can send 17[K] worth of braces."

gg.  On or about July 8, 2021, BLS received $1,299 in kickbacks for supplying D.O.'s.

hh.  On or about September 8, 2022, BLS received $823 in kickbacks for supplying D.O.'s.

All in violation of Title 18, United States Code, Section 371.

### Counts 2 - 7

Health Care Fraud

(18 U.S.C. § 1347)

26.  Paragraphs 1 through 17 of the Introductory Allegations of this Indictment are re-alleged and incorporated by reference.

27. Beginning no later than in or about 2016, and continuing through in or about 2022, within the Southern District of California and elsewhere, defendants JOSE PORTILLA and KATHIE SILVA knowingly and willfully devised and intended to devise a material scheme and artifice to defraud Medicare, a health care benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), and to obtain by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare, in connection with the delivery of, and payment for, health care benefits and services.

28. Paragraphs 21 and 22 of this Indictment are realleged and incorporated by reference as more fully describing the defendants' scheme to defraud.

29. On or about the dates set forth below, within the Southern District of California and elsewhere, JOSE PORTILLA and KATHIE SILVA knowingly and willfully executed the scheme to defraud described above by submitting, and causing to be submitted, a claim for reimbursement from Medicare, for the following beneficiaries, for the following DME items, in the following amounts, with each claim constituting a separate count:

| Count | Date | DME co. | Beneficiary | DME Items | Claim Amount |
|-------|------|---------|-------------|-----------|--------------|
| 2 | 12/5/19 | Spectra | Maria P. | Knee brace | $1,075.00 |
| 3 | 1/17/20 | Titan DME | Rosa R. | Back brace, right and left knee braces, 2 suspension sleeves | $3,788.27 |
| 4 | 1/21/20 | Titan DME | Maria C. | Back brace | $1,229.76 |
| 5 | 1/22/20 | Titan DME | Ramona L. | Back brace, knee brace, suspension sleeve | $2,597.60 |

17

| Count | Date | DME co. | Beneficiary | DME Items | Claim Amount |
|---|---|---|---|---|---|
| 6 | 1/22/20 | Titan DME | Mary C. | Right and left knee braces, 2 suspension sleeves | $2,410.82 |
| 7 | 10/1/20 | HealthStar | Consuelo F. | Right knee brace, suspension sleeve | $1,371.06 |

### Counts 8 - 16

Soliciting and Receipt of Illegal Remuneration

(42 U.S.C. § 1320a-7b(b)(1)(A))

30.    Paragraphs 1 through 21 of the Introductory Allegations of this Indictment are re-alleged and incorporated by reference.

31.    Beginning no later than in or about 2016, and continuing through in or about 2022, within the Southern District of California and elsewhere, defendants JOSE PORTILLA and KATHIE SILVA did knowingly and willfully solicit and receive any remuneration (including any kickback, bribe, or rebate) directly and indirectly, overtly and covertly, in cash and in kind, in return for referring individuals to DME companies and "marketing companies" for the furnishing and arranging for the furnishing of durable medical equipment, payment for which was made in whole and in part under a federal health care program, namely, Medicare, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A), including each of the payments below, which were kickbacks received for D.O.'s sold by BLS, with each payment forming a separate count:

| Count | Date | Payor | Amount |
|---|---|---|---|
| 8 | 2/2/22 | Prizm Media Inc. | $1,170.00 |
| 9 | 2/10/22 | Prizm Media Inc. | $915.00 |
| 10 | 2/18/22 | Prizm Media Inc. | $745.00 |
| 11 | 2/24/22 | Prizm Media Inc. | $490.00 |

| Count | Date | Payor | Amount |
|-------|--------|-------------------|-----------|
| **12** | 3/3/22 | Prizm Media Inc. | $1,510.00 |
| **13** | 4/20/22 | Prizm Media Inc. | $1,224.00 |
| **14** | 7/2/22 | Prizm Media Inc. | $1,299.00 |
| **15** | 7/14/22 | Prizm Media Inc. | $986.00 |
| **16** | 7/20/22 | Prizm Media Inc. | $680.00 |
| **17** | 7/27/22 | Prizm Media Inc. | $976.00 |

In violation of Title 42, U.S.C. Section 1320a-7b(b)(2)(A).

### Counts 18 - 25

Payment of Illegal Remuneration

42 U.S.C. § 1320a-7b(b)(1)(A)

32.    Paragraphs 1 through 19 of the Introductory Allegations of this Indictment are re-alleged and incorporated by reference.

33.    Beginning no later than in or about 2016, and continuing through in or about 2022, within the Southern District of California and elsewhere, defendants JOSE PORTILLA and KATHIE SILVA did knowingly and willfully pay any remuneration (including any kickback, bribe, or rebate) directly and indirectly, overtly and covertly, in cash and in kind, to induce persons, namely, telemedicine doctors and medical providers, to refer individuals to DME companies for the furnishing and arranging for the furnishing of durable medical equipment, payment for which was made in whole and in part under a federal health care program, namely, Medicare, in violation of 42 U.S.C. § 1320a-7b(b)(2)(A), each payment forming a separate count:

| Count | Date | Payee | Amount |
|-------|------|-------|--------|
| **18** | 4/16/20 | MedTech Worldwide, Inc. | $10,090.00 |
| **19** | 5/14/20 | MedTech Worldwide, Inc. | $17,575.00 |
| **20** | 5/22/20 | MedTech Worldwide, Inc. | $10,150.00 |
| **21** | 5/28/20 | MedTech Worldwide, Inc. | $11,010.00 |
| **22** | 6/4/20 | MedTech Worldwide, Inc. | $12,040.00 |
| **23** | 6/11/20 | MedTech Worldwide, Inc. | $18,385.00 |
| **24** | 7/2/20 | MedTech Worldwide, Inc. | $27,215.00 |
| **25** | 7/23/20 | MedTech Worldwide, Inc. | $28,120.00 |

<u>FORFEITURE ALLEGATIONS</u>

(18 U.S.C. §§ 982(a)(7) and 982(b))

34.   Paragraphs 1 through 20 of the Introductory Allegations and Counts 1 through 25 of this Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture to the United States pursuant to Title 18, United State Code, Sections 982(a)(7) and 982(b).

35.   Upon conviction of one and more of the offenses alleged in Counts 1 through 25 of this Indictment and pursuant to Title 18, United States Code, Section 982(a)(7), and Rule 32.2, Federal Rules of Criminal Procedure, defendants JOSE PORTILLA and KATHIE SILVA shall forfeit to the United States any property, real and personal, which constitutes and is derived from gross proceeds raceable to the commission of the offenses.

36.   If, as a result of any act or omission of defendants JOSE PORTILLA and KATHIE SILVA any of the above-described forfeited property, cannot be located upon the exercise of due diligence; has been transferred or sold to, or deposited with, a third person; has been placed beyond the jurisdiction of the Court; has been substantially

diminished in value; or has been commingled with other property which cannot be subdivided without difficulty, it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), made applicable herein by Title 18, United States Code, Section 982(b), to seek forfeiture of any other property of the defendants up to the value of the property described above subject to forfeiture.

All pursuant to Title 18, United States Code, Sections 982(a)(7) and 982(b).

     DATED: June 18, 2024.

TARA K. McGRATH
United States Attorney

By: _____
    VALERIE H. CHU
    Assistant U.S. Attorney

21